UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WATM LLC d/b/a STEVENS & ASSOCIATES/STEVENS MANAGEMENT ASSOCIATES,<br><br>Plaintiff-Counterclaim Defendant,<br><br>v.<br><br>PAYMENT ALLIANCE INTERNATIONAL, INC.,<br><br>Defendant-Counterclaim Plaintiff,<br><br>v.<br><br>RICHARD S. TOWNLEY, an individual,<br><br>Counterclaim Defendant. | CASE NO. 2:24-cv-00405-JHC<br><br>ORDER |

# I

## INTRODUCTION

This matter comes before the Court on the parties' motions for summary judgment. *See* Dkt. ## 94, 100.  The Court has considered the materials filed in support of and in opposition to the motions, the rest of the file, and the governing law.  The Court finds oral argument unnecessary.  Being fully advised, for the reasons below, the Court GRANTS WATM LLC and

ORDER - 1

Richard Townley's motion and GRANTS in part and DENIES in part Payment Alliance International's motion.

## II
### BACKGROUND

These facts are undisputed except where noted.

A.  The Parties' Relationship

Defendant Payment Alliance International (PAI) provides ATM management tools and services across the United States. Dkt. # 33-2 at 2 ¶ 2. Plaintiff WATM LLC provides ATM and payment-related services to about 300 merchants. Dkt. # 1-2 at 2 ¶ 2. PAI provides processing services to WATM for their debit, credit, and ATM terminals. Dkt. # 33-2 at 2 ¶ 3.

This matter concerns PAI's seizure of funds that it alleges WATM generated by operating so-called "scrip" or "script" ATMs, also known as "cashless payment terminals." Dkt. # 100 at 15–16. PAI says that it does not permit the use of scrip terminals in its ATM network, which WATM used. *Id.*

Scrip ATMs work differently than traditional ATMs. While they look like any other ATM terminal, they do not dispense cash: WATM says that they "generate a voucher (aka, the 'scrip') that the customer redeems for the product from the merchant." Dkt. # 96 at 58:6–23. PAI says that when a cardholder transacts using a scrip ATM, they enter their debit card and PIN and enter the amount of the sale from the merchant. This figure is "booked as an ATM withdrawal from the customer's account, though no cash is ever dispensed to the customer." Dkt. # 4 at ¶ 10.

PAI and WATM do not have a contract. Rather, PAI has a contract, called the ISR Agreement, with a nonparty entity called NYC ATM Corp. *See* Dkt. # 102 at 2, ¶ 5. PAI refers to NYC ATM as a "market partner." Dkt. # 101 at 20, 44:20–17. In the ISR Agreement, NYC

ORDER - 2

ATM is referred to as the "Independent Sales Representative" or ISR. Dkt. # 102 at 5. In turn, NYC ATM has an agreement with another nonparty called Phazari, which PAI refers to as a "sub partner" of NYC ATM. Dkt. # 101 at 20, 44:20–17. Phazari, then, has an agreement with WATM, making WATM a "sub partner" of Phazari. *Id*. PAI also refers to NYC ATM as a "parent partner." *Id*. at 45:6–7. PAI has no communication with the sub partners and relies on NYC ATM for any communications. Dkt. # 101 at 38:25–39:22. The ISR Agreement permits NYC ATM to connect sub partners to the network provided they have agreements with NYC ATM and abide by certain conditions in the ISR Agreement. Dkt. # 102 at 9–10, §§ 3.1, 3.5.

The way the money exchanges hands, and how these entities make their profit, follows these contractual relationships. When a person uses their debit card on a scrip ATM, the ATM's screen asks notifies the cardholder that they will be charged a fee. Dkt. # 1-2 at 4, ¶ 20. This fee is known as the "surcharge fee," which the cardholder pays. *Id*. ¶¶ 19–20. When the cardholder accepts, PAI sends a signal to their bank, which, assuming a balance is available, sends a signal back (via PAI) to dispense the cash, debiting from that person's account the cash amount as well as the listed (surcharge) fee. *Id*. ¶ 21; Dkt. # 101 at 39:25–40:8. But the cardholder's bank also pays to a fee, called the "interchange fee," which goes to PAI. *Id*. at 40:10–13. PAI, now in possession of the surcharge and interchange fees, subtracts what it calls its "buy-rate." *Id*. at 44:7–45:20 (filed under seal).[1] This buy-rate becomes PAI's profit after it sends a portion of it to PAI's sponsoring bank and pays for overhead. *Id*. Per the ISR Agreement it has with NYC ATM, PAI then passes the remainder of the fees to NYC ATM, Phazari, and WATM, in separate amounts, according to a split communicated by NYC ATM. *See* Dkt. # 102 at 3, ¶ 11; *id*. at 13, § 7.2.

---

[1] The unredacted version is located at Dkt. # 106.

The ISR Agreement, in a section titled "Covenants of [NYC ATM]," states that "Scrip Terminals will not be activated." Dkt. # 102 at 11, art. V(e). The ISR Agreement also contains indemnification provisions. One of these provisions states that NYC ATM "shall indemnify and hold [PAI] harmless from any and all liability or Expenses or claims of third parties relating thereto." *Id.* at 15, § 8.5. In another provision, NYC ATM agrees to indemnify PAI "against any losses or Expenses arising from any legal action . . . brought against [PAI] as a result of any misrepresentation, breach of warranty, or failure to fulfill a covenant of this Agreement on the part of ISR, any act or omission of ISR or its providers which violations any law, . . . or any claim relating to obligations owed to or by ISR or any third party retained by it." *Id.* at 18, § 12.1(a).

WATM says that it learned from another company that PAI supported scrip terminals. *See* Dkt. # 95 at 3, ¶ 8. After so learning, in 2019, WATM onboarded its business with Phazari, with the understanding that Phazari was a "sub agent" of NYC ATM, itself connected to PAI. *See id.* ¶¶ 8–12. PAI denies that it ever represented that it supports scrip terminals, pointing to its ISR Agreement. Dkt. # 102 at 11, art. V(e).

B.   Facts Giving Rise to Suit

Starting in February 2022, apparently spurred on by the risk of liability to Visa and its sponsoring bank MetaBank (both nonparties), PAI began actively searching its network for connected scrip terminals. *See* Dkt. # 132 at 90–91, 97:23–98:17. Visa does not permit the use of scrip terminals in its network. *See id.* at 26–27. PAI undertook a significant effort, which it internally called "Project Up in Smoke" or "Project Smoke," to identify and disconnect from its network suspected scrip terminals. *See id.* at 81–82, 46:1-47:7 (filed under seal).[2] This effort

---

[2] Sealed unredacted: Dkt. # 119 at 21–22, 46:9-47:7.

involved developing a method to identify suspected scrip terminals, *see id.*, as well as physically inspecting several. *See* Dkt. # 122 (filed under seal).[3]

Though the coordinated effort appears to have begun in February 2022, PAI appears to have known by December 2020 that at least some of the terminals that WATM had connected to its network via the sub partners were scrip terminals. In December 2020, a PAI employee told a senior vice president that he was "95% sure" that a list of terminals circulated internally through PAI were scrip terminals. *See* Dkt. # 130 at 69–70. That vice-president felt certain enough in the identification (despite the lack of 100% certainty) that he instructed the first employee to shut down eight of the suspected terminals. *See id.* at 71–72. By July 2021, PAI had identified hundreds more WATM terminals that it believed were scrip machines. *See id.* at 75–88. Another PAI employee stated, of these hundred terminals, that it was "CLEAR as DAY" that many of these were scrip terminals. *See* Dkt. # 96-1 at 147. But at that time, PAI did not shut down or disconnect the terminals, as senior PAI employees testified in depositions. *See, e.g.*, Dkt. # 98 at 43, 162:20–23 (filed under seal); *id.* at 122, 147:19–24 (filed under seal). Thus, PAI was aware by July 2021 that WATM had connected many scrip terminals to their network, but it was not until the first half of 2022 that PAI undertook a concerted effort to remove them from the network.

In December 2022, having identified connected scrip ATMs belonging to WATM, PAI began to withhold the fees from NYC ATM and WATM. *See* Dkt. # 1-2, ¶ 35; Dkt. # 4, ¶ 35. PAI notified NYC ATM that the activation of scrip terminals contravened their contract. Dkt. # 101 at 90. PAI did not notify WATM or Phazari. The total amount of fees withheld by PAI at

---

[3] Sealed unredacted: Dkt. # 119 at 122, 25:17–22.

ORDER - 5

that time was $1,897,003.37, Dkt. # 130 at 3, and PAI indicates that this figure includes amounts that PAI would have passed on to NYC ATM, Phazari, and WATM. Dkt. # 100 at 9, n. 8.

C.     Procedural Background

In March 2024, WATM sued PAI, claiming conversion and unjust enrichment and seeking an accounting. *See* Dkt. # 1-2. PAI counterclaimed for unjust enrichment. *See* Dkt. # 4. PAI later amended its counterclaim to add a common law fraud claim against both WATM and its manager, Steven Townley, in his personal capacity. *See* Dkt. # 84. The parties now cross-move for summary judgment, seeking dismissal of the other parties' claims. *See* Dkt. # 94 (WATM and Townley's motion seeking dismissal of PAI's counterclaims); Dkt. # 100 (PAI's motion seeking dismissal of WATM's claims).

### III
### DISCUSSION

A.     Summary Judgment Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000). But a court will not "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

ORDER - 6

B.  Unjust Enrichment

To prevail on an unjust enrichment claim, a plaintiff must show that (1) it conferred a benefit on the defendant, which came at its own expense; (2) the defendant knew and appreciated the benefit; and (3) this occurred under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. *Young v. Young*, 164 Wash. 2d 477, 484, 191 P.3d 1258 (Wash. 2008) (citation omitted). "Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." *Id.* "The core of unjust enrichment is the notion that a defendant has received a right or benefit that belonged to the plaintiff." *BOFI Fed. Bank v. Advance Funding LLC*, 2015 WL 5008860, at *2 (W.D. Wash. Aug. 20, 2015) (citing *Young*, 164 Wash. 2d at 484); *see also Farwest Steel Corp. v. Mainline Metal Works, Inc.*, 48 Wash. App. 719, 731–32, 741 P.2d 58 (1987) (requiring the defendant's enrichment to be "at the expense of another contrary to equity").

1.  PAI's unjust enrichment claim

PAI's pleading and briefing do not make clear what set of funds is at issue with respect to its unjust enrichment claim. There appear to be three potential pots. In its amended counterclaim, PAI states that it seeks recovery in unjust enrichment for the "services and resources relating to ATM terminals" that it provided to WATM. See Dkt. # 84 at ¶¶ 30–32. But it also appears to consider the fees that it did distribute to WATM, and would have distributed to WATM if not for its seizure, as the funds at issue. *See id.* ¶ 31. PAI contends that because WATM's conduct (operating scrip terminals) was illegal under the ISR Agreement (to which WATM is not a party), it has "superior possession rights" to the fees it withheld from WATM. Dkt. # 115 at 20. The ISR Agreement states that PAI has the "sole and exclusive right, title and interest in and to all Processing Fees," and that any disbursement of those fees is

ORDER - 7

"[s]ubject to the terms and conditions" of the ISR Agreement, which includes a prohibition on the activation of scrip terminals. *See* Dkt. # 102 at 13–14, §§ 7.2(a), 7.3. PAI also states that the risk of fines that Visa could have imposed constitutes a basis for recovery in unjust enrichment. *See* Dkt. # 115 at 21–23.

WATM says that PAI profited off WATM's transactions, which undermines the latter's unjust enrichment claim. *See* Dkt. # 94 at 22–25. WATM says it is undisputed that PAI received the expected buy rate from every transaction in processed. Thus, it cannot be said that any of the benefits WATM received were "at PAI's expense," and PAI cannot sustain an unjust enrichment claim.

WATM's argument prevails for two reasons. First, with respect to the fees, PAI's claimed "superior possession rights" does not align with any of the three elements of the unjust enrichment standard. The phrase appears to gesture at the third element, that WATM's receipt of fees transmitted by PAI occurred "under such circumstances as to make it inequitable for [WATM] to retain the benefit without the payment of its value." *See Young*, 164 Wash. 2d at 484. Moreover, this argument appears to make little sense considering that the source of the funds to which PAI claims superior possession are the cardholders, banks, and card networks that send it fees—not PAI[4]. *See* Part II.A, above, at page 3. Second, with respect to services and resources as well as the fees, that PAI profited from its relationship with WATM vitiates its argument that it would be unjust for WATM to retain any benefits it received. WATM has adduced evidence, unrebutted by PAI, that PAI profited from WATM's transactions. A senior

---

[4] Indeed, unjust enrichment claims often concern the value of unpaid work and courts have noted their similarity to quantum meruit claims. *See, e.g.*, *Bort v. Parker*, 110 Wash. App. 561, 579–80, 42 P.3d 980 (Wash. Ct. App. 2002) ("[u]njust enrichment and quantum meruit are related doctrines" and reversing summary judgment that dismissed a contractor's unjust enrichment and quantum meruit claims).

ORDER - 8

vice-president at PAI testified under oath that PAI's processing of WATM's transactions were always "net positive" and that they were "always in the black" for PAI. *See* Dkt. # 96-1 at 17, 41:2–19. PAI's 30(b)(6) representative testified under oath that he agreed with the statement that "PAI made money off of all of WATM's transactions" and that "every transaction of WATM's was profitable for PAI." *See id.* at 110, 144:16–21. And PAI has presented no evidence to rebut this testimony. While it asserts in its brief that "it is a question of fact whether PAI even did 'profit' from WATM's illicit transactions," Dkt. # 115 at 21, at summary judgment, PAI must point to evidence. *See Celotex Corp.*, 477 U.S. at 322.

Nor can PAI sustain an unjust enrichment claim on the basis that the "risk" it faced amounts to a benefit that it provided WATM for which it must be compensated. It identifies no caselaw in which a court authorized recovery for "exposure to risk" through an unjust enrichment claim, nor can the Court locate any. The only authority PAI marshals supports the proposition that intangible harms like an exposure to business risk may be factored as damages. *See* Dkt. # 115 at 22 (citing *Inteum Co., LLC v. Nat'l Univ. of Singapore*, 371 F. Supp. 3d 864, 884 (W.D. Wash. 2019); *JB Carter Enters., LLC v. Elavon, Inc.*, 854 Fed. Appx. 144, 148 (9th Cir. 2021)). This is true but beside the point: While exposure to risk may constitute damages, it is not a "benefit" provided to WATM that could establish an unjust enrichment claim. Summary judgment dismissal must be granted with respect to PAI's unjust enrichment claim.

2.   WATM's unjust enrichment claim

PAI contends that WATM cannot sustain an unjust enrichment claim because WATM is an intended third-party beneficiary to the ISR Agreement. *See* Dkt. # 100 at 22–24. Because it is a third-party beneficiary, in PAI's telling, it is subject to that contract and cannot bring an unjust enrichment claim. *Id.* at 22 (citing *Kersteter v. Concrete Sch. Dist.*, 2022 WL 766218, at *5 (Wash. Ct. App. Mar. 14, 2022). PAI says that WATM must be considered a third-party

ORDER - 9

beneficiary because it will receive "*direct* benefits" from the ISR Agreement. *Id.* at 23 (citing *Key Dev. Inv., LLC v. Port of Tacoma*, 173 Wash. App. 1, 27–31, 292 P.3d 833 (Wash. Ct. App. 2013)); *see also Krefting v. Kaye-Smith Enterprises, Inc.*, 2023 WL 4846850, *7 (W.D. Wash. July 28, 2023) (a party is a third-party beneficiary if performance of the contract will "necessarily and directly benefit the party"). PAI says that the ISR Agreement envisions benefiting third parties like WATM, since it states that PAI will provide services to ATMs either owned or operated by NYC ATM or by a third-party "ATM Operator" with whom NYC ATM contracts. *See id.* at 23.

WATM says that it is not a third-party beneficiary. But even assuming WATM is a third-party beneficiary, Washington law does not appear to preclude a party from asserting an unjust enrichment claim where it could assert a third-party beneficiary claim but has chosen not to do so. It is true that a "plaintiff who is party to a valid contract may not bring a claim for unjust enrichment for issues arising under the contract's subject matter." *See Hold Sec. LLC v. Microsoft Corp.*, 705 F. Supp. 3d 1231, 1244 (W.D. Wash. 2023); *see also Hurlbut v. Crines*, 14 Wash. App. 660, 671, 472 P.3d 263 (Wash. Ct. App. 2020) (between parties subject to a disputed easement, "the courts will not allow a claim for unjust enrichment in contravention of a provision in a valid express contract."). This accords with the proposition that a third-party beneficiary may sue on a contract if that contract "is for his direct benefit," but not if "his benefit under it is merely incidental, indirect, or consequential." *Lonsdale v. Chesterfield*, 19 Wash. App. 27, 30, 573 P.2d 822 (Wash. Ct. App.), *rev'd, aff'd on other grounds*, 91 Wash. 3d 189, 588 P.3d 217 (Wash. 1978). But it does not follow, from these propositions, that a third-party beneficiary, who is not a "party" to the contract, is similarly barred from asserting an unjust enrichment claim. Unjust enrichment "is the method of recovery for the value of the benefit retained absent any contractual relationship." *See Young*, 164 Wash. 2d at 484. This definition does not exclude

ORDER - 10

recovering in unjust enrichment even though the plaintiff may also be a third-party beneficiary. PAI cites no Washington case law holding that a third-party beneficiary has no unjust enrichment claim on subject matter covered by the contract benefitting them as a third party, nor has the Court located any.

PAI's only case is distinguishable. In *Krefting v. Kaye-Smith Enterprises*, the plaintiff sued his bank and its printing vendor, claiming unjust enrichment following a data breach affecting the vendor that revealed the personally identifiable information of the bank's customers. *See* 2023 WL 4846850, at *1. The plaintiff had a contract with the bank, but not with the vendor. The court dismissed the plaintiff's unjust enrichment claim because of the existence of the contract, reasoning that it covered the subject matter of his unjust enrichment claim, even though the vendor was not a party to it. *Id.* at *6–7. *Krefting* supports the proposition that a plaintiff who *is* a party to an express contract may not assert an unjust enrichment claim against a noncontractual defendant. It does not follow, as PAI asserts, that the inverse is true: that WATM may not assert an unjust enrichment claim because the ISR Agreement covers the subject matter of the dispute. Put differently, WATM has signed no contract covering the subject matter of their unjust enrichment claim, and so they may assert that claim.

PAI raises no other arguments about the impropriety of WATM's unjust enrichment claim. Accordingly, the Court must deny PAI's motion for summary judgment. While perhaps Washington law prevents a third-party beneficiary from asserting *both* an unjust enrichment claim *and* a remedy on that contract, that is not the scenario presented here, where WATM does not assert a contract claim.

ORDER - 11

C.  WATM's Conversion Claim

To demonstrate a claim for conversion, a plaintiff must show: (1) willful interference with chattel belonging to the plaintiff; (2) by either taking or unlawful retention; (3) thereby depriving the owner of possession. *Burton v. Spokane*, 16 Wash. App. 769, 773, 482 P.3d 968 (Wash. App. 2021) (citing *Judkins v. Sadler-MacNeil*, 61 Wash. 2d 1, 3, 376 P.2d 837 (Wash. 1962)). The "essence" of conversion is the dispossession of property from its rightful owner. *Repin v. State*, 198 Wash. App. 243, 271, 392 P.3d 1174(Wash. App. 2017). Money can be the subject of conversion "if the party charged with conversion wrongfully received the money or had an obligation, which it failed to honor, to return the specific money to the party claiming it." *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1039 (9th Cir. 2010) (citing *Public Utility Dist. 1 of Lewis Cnty. v. Wash. Pub. Power Supply Sys.*, 104 Wash. 2d 353, 378, 705 P.2d 1195 (Wash. 1995).

PAI argues that WATM cannot maintain a claim for conversion because it cannot establish that PAI "wrongfully received" the funds (i.e., the surcharge and interchange fees) at issue. Dkt. # 100 at 25–26 (citing *Taie v. Ten Bridges LLC*, 704 F. Supp. 3d 1147, 1156 (W.D. Wash. 2023). PAI says that for it to have "wrongfully received" the money, WATM would have to establish "a right to possession of" that money, which it cannot do because it did not comply with the ISR Agreement. *Id.* In any event, PAI says, it cannot be said to have "wrongfully received" that money because all it did was retain the funds at issue: It did not wrongfully receive the surcharge and interchange fees because it collected those fees in the performance of the ISR Agreement. *Id.* at 27–28.

WATM responds that the applicable legal standard permits conversion claims when the accused party "had an obligation, which it failed to honor, to return the specific money to the party claiming it." Dkt. # 111 at 26 (citing *Taie*, 704 F. Supp. 3d at 1156). WATM has a

claimed property interest in the funds since the $1.8 million in withheld fees were generated by terminals that it managed.  *Id.* at 27.  "Even if PAI was under the mistaken belief it could withhold the funds," WATM argues, "PAI's willful interference with WATM's possession of its earned revenue is sufficient to establish a claim of conversion."  *Id.* at 27–28 (citing *Brown ex rel. Richards v. Brown*, 157 Wash. App. 803, 820, 239 P.3d 602 (Wash. 2010)).  Further, WATM says, "[w]hether money has been wrongfully received or retained is a question of fact."  *Id.* at 27 (citing *Brown*, 157 Wash. App. 803 at 818.

  Whether WATM has a property interest in the funds at issue sufficient to maintain its conversion claim depends on whether PAI "was under obligation to return the specific money to the party claiming it."  *Davenport v. Wash. Educ. Ass'n*, 147 Wash. App. 704, 722, 197 P.3d 686, 695 (2008) (citing *Public Util. Dist. No. 1*, 104 Wash. 2d at 378).  Thus, the key question is whether PAI's retention of the funds was wrongful in some way. At the very least, there are questions of fact as to whether WATM was bound by the prohibition on scrip terminals.  To be sure, WATM is not a party to the ISR Agreement.  Nor is it clear that WATM knew of the ISR Agreement's prohibition on scrip terminals.  WATM states that Phazari led it to believe that PAI supported scrip terminals.  *See* Dkt. # 95 at 3, ¶¶ 11–14.  Further, NYC ATM also appears to have believed that PAI supported scrip terminals.  *See* Dkt. # 130 at 18 (Dar Reynolds, employee of NYC ATM, stating that he "truly didn't know" that scrip terminals were "not allowed).  On the other hand, WATM did receive what was described as an "auto-generated" email from PAI in which PAI said that it did not permit scrip terminals on its network.  *See* Dkt. # 118 at 94, 115:1–16 (30(b)(6) deposition).

  The rest of the ISR Agreement suggests that the risk of connecting noncompliant ATMs, like scrip terminals, to PAI's network falls on NYC ATM.  In no provision of the ISR Agreement does NYC ATM promise that its submarket partners like WATM will abide by the

ORDER - 13

provisions of the ISR Agreement. Section 8.3 provides that NYC ATM will be liable for any claim by someone using an ATM "as a result of the failure of [NYC ATM] or any of [NYC ATM's] ATM Operator's [*sic*] to comply with the Rules, Network or applicable Regulatory Authority." *Id.* § 8.3. The ISR Agreement's indemnification provision states that NYC ATM "covenants and agrees to indemnify and hold harmless [PAI] . . . against any losses or Expenses arising from any legal action, claim, demand or proceedings brought against any of them as a result of any misrepresentation, breach of warranty or failure to fulfill a covenant of this Agreement on the part of [NYC ATM], any act or omission of [NYC ATM] or its providers which violates any law, By-laws or Governmental Requirements, or any claim relating to obligations owed to or by [NYC ATM] or any third party retained by it." *Id.* § 12.1(a). These provisions suggest that any harm befalling PAI for WATM's use of scrip terminals is redressable by NYC ATM, which does not permit PAI to withhold funds *from WATM* for using scrip terminals.

As there are issues of fact as to whether WATM is bound by the prohibition on scrip terminals, there are questions as to whether it was wrongful for PAI to withhold funds that arguably belonged to WATM, because they were generated by WATM's terminals. Ultimately, because "[w]hether money has been wrongfully received or retained is a question of fact," *Brown*, 157 Wash. App. at 818, and as those fact questions are disputed, the Court must deny PAI's motion as to WATM's conversion claim.

D.     WATM's accounting claim

"To compel an accounting, a plaintiff must show (1) that a fiduciary relationship exists between the parties; (2) that the plaintiff has demanded an accounting from the defendant; and (3) that the defendant refused." *Vaughn v. Montague*, 924 F. Supp. 2d 1256, 1268 (W.D. Wash. 2013) (citing *State v. Taylor*, 58 Wash. 2d 252, 262 (1961)).

ORDER - 14

PAI argues that WATM cannot make the necessary showing to compel an accounting because no fiduciary relationship exists between PAI and WATM, WATM never demanded that accounting, and, in any event, discovery in the litigation has revealed to WATM the financial information that an accounting would provide. *See* Dkt. # 100 at 28–30. WATM says that the facts of PAI and WATM's relationship establish PAI's fiduciary obligations to WATM, and that in response to its discovery requests PAI has not provided a full accounting, preventing it from determining its exact damages. *See* Dkt. # 111 at 28–30.

A "fiduciary relationship can [] arise in fact regardless of the relationship in law between the parties." *Liebergesell v. Evans*, 93 Wash. 2d 881, 890, 362 P.2d 247 (Wash. 1980). They may arise where "one party has superior knowledge and thereby induces reliance in the other party." *Pope v. Univ. of Wash.*, 121 Wash. 2d 479, 492, 852 P.2d 1055 (Wash. 1993) (citing *Liebergesell*, 93 Wash. 2d at 891). "Generally, participants in a business transaction deal at arm's length." *Liebergesell*, 93 Wash. 2d at 889. A "fiduciary relationship arises in fact when there is something in the particular circumstances which approximates a business agency, a professional relationship, or a family tie, something which itself impels or induces the trusting party to relax the care and vigilance which he otherwise should, and ordinarily would, exercise." *Alexander v. Sanford*, 181 Wash. App. 135, 173, 325 P.3d 341 (Wash. Ct. App. 2014) (citations omitted).

The Court must dismiss WATM's accounting claim because there is no fiduciary relationship between PAI and WATM. The record shows that the only relationship between the parties was PAI's transmittal (until it stopped) of fees generated by WATM's scrip terminals to WATM. WATM argues that PAI's role as a "collector and distributor of WATM's funds sufficiently establishes the fiduciary nature" of the parties' relationship. *See* Dkt. # 111 at 29. But PAI's point that this relationship is more like that between a bank and its depositors is well-

taken, and under Washington law, banks do not owe fiduciary duties to their deposit customers. *See* Dkt. # 121 at 12 (citing *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 33 Wash. App. 456, 458–59, 656 P.2d 1089 (Wash. Ct. App. 1982) ("As a general rule, the relationship between a bank and a depositor or customer does not ordinarily impose a fiduciary duty of disclosure upon the bank."). Nothing in the record shows that PAI made statements to WATM or otherwise induced WATM's reliance on its advice such that a fiduciary relationship could exist between them.

E.  PAI's Fraud Claim against WATM and Townley

To demonstrate fraud, a plaintiff must establish each of these elements: "(1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff." *Adams v. King Cnty.*, 164 Wash. 2d 640, 662, 192 P.3d 891 (Wash. 2008) (citing *Stiley v. Block*, 130 Wash. 2d 486, 505, 925 P.2d 194 (Wash. 1996)). Each element of fraud must be established by clear, cogent, and convincing evidence. *Stiley,* 130 Wash. 2d at 505.

WATM and Townley seek summary judgment dismissal of PAI's fraud claim. They contend that PAI cannot show two required elements. WATM says that, first, PAI cannot show damages, because it profited from the alleged fraud. Dkt. # 94 at 26–27. Second, WATM says that, even assuming WATM made misrepresentations, PAI cannot show ignorance of this misrepresentation, because it knew that the terminals were cashless and continued processing them for years. *Id.* at 27–30. Last, WATM says that Townley cannot be held liable because PAI cannot demonstrate sufficient cause to pierce the corporate veil, since Townley acted as

WATM's manager and did not abuse "the corporate form" to "violate or evade a legal obligation." *Id.* at 31 (citation omitted).

PAI responds that it suffered actual damages in the form of the fees it did transmit to WATM, as well as the risk it faced when WATM connected scrip terminals. Dkt. # 115 at 24. PAI also says that it relied on WATM's fraudulent misrepresentations, and that, in any event, the question is one of fact that should go to a jury because its reliance on the alleged misrepresentation was not "manifestly unreasonable in the light of [their] own intelligence or information." *Id.* (citing *Dent v. Nat'l Football League*, 902 F.3d 1109, 1124 (9th Cir. 2018)). PAI also says that the law allows Townley to be held personally liable because he "personally" directed the alleged scheme to defraud PAI. Dkt. # 115 at 26–27.

Because PAI did not actually lose money on any of the transactions it processed from WATM, as recounted above, PAI's fraud claim relies on the theory that its exposure to legal risk could constitute damages that would satisfy the fraud standard. Though a defrauded plaintiff is entitled to recover damages "for losses proximately caused by the fraudulent conduct," *Guy Mitchell & Betty J. Mitchell Fam. Tr. v. Artists Rts. Enf't Corp.*, 2013 WL 890478, at *7 (E.D. Wash. Mar. 8, 2013), PAI identifies no cases in which courts have permitted a plaintiff to show damages in a fraud claim by pointing to increased legal risk, or unmaterialized future risk at all. As far as the record shows, neither Visa nor any other bank or network has fined PAI. In other tort contexts, a plaintiff "must be able to point to more than a 'mere danger of future harm, unaccompanied by present damage.'" *Brewer v. Lake Easton Homeowners Assoc.*, 2 Wash. App. 2d 770, 780–81, 413 P.3d 16 (Wash. Ct. App. 2018) (citing *Gazija v. Nicholas Jerns Co.*, 86 Wash.2d 215, 219, 543 P.2d 338 (Wash. 1975); *see also Walston v. Boeing Co.*, 173 Wash. App. 271, 287, 294 P.3d 759 (Wash. Ct. App. 2013) (in worker's compensation claim, the "[r]isk of injury, even risk amounting to substantial certainty of injury, is not certain injury" sufficient to

show harm for damages), *aff'd*, 181 Wash. 2d 391, 334 P.3d 519 (Wash. 2014), *overruled on other grounds by*, *Cockrum v. C.H. Murphy/Clark-Ullman, Inc.*, 4 Wash. 3d 873, 891, 569 P.3d 287 (Wash. 2025).

PAI points to persuasive authority that "'the time spent dealing with the [future] harm' and other, similarly intangible harms, are cognizable injuries, so long as the harm being avoided is not speculative." Dkt. # 115 at 24 (citing *Ortiz v. Perkins & Co.*, 2022 WL 16637993, at *4 (N.D. Cal. Nov. 2, 2022)). First, *Ortiz* discusses injury for standing purposes, not damages in a fraud case. And in any event, the opinion is limited to the data breach context in which "the information stolen could be used to commit identity theft." *Id.* Since, presumably, the point of a data breach is to gather information with which to commit identity theft, the risk of such identity theft follows proximately from that data breach, which confers standing on those whose information was stolen. PAI also says that intangible harms like lost profits, lost business opportunities, lost existing and new business, and reputational harm can satisfy the fraud standard's damages provision, *see* Dkt. # 115 at 22, but PAI has not alleged that any of these intangible harms actually occurred, much less presented any evidence. And the other cases that PAI relies on suggest that actual damages are required. In *Inteum Co.*, a court in this District rejected an unjust enrichment claim because the plaintiff did not offer "evidence showing that it has suffered any actual loss from the alleged misappropriations, such as lost profits or business opportunities." 371 F. Supp. 3d at 884. In *JB Carter Enterprises*, the Ninth Circuit evaluated Nevada law, and in any event only reinstated a negligent misrepresentation claim because the record "contain[ed] evidence showing that" the plaintiff "suffered some amount of reputational harm to its business." 854 Fed. Appx. at 148.

Because PAI does not present evidence of damages, its fraud claim fails.

ORDER - 18

# IV

## CONCLUSION

For the reasons above, the Court GRANTS WATM and Townley's motion for summary judgment and DISMISSES PAI's unjust enrichment and common law fraud claims with prejudice. The Court GRANTS in part and DENIES in part PAI's summary judgment motion and DISMISSES WATM's accounting claim with prejudice.

Dated this 8th day of January, 2026.

*John H. Chun*
John H. Chun
United States District Judge